## MELLEN *v.* BUCKNER.

## BUCKNER *v.* MELLEN.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF LOUISIANA.

Nos. 13, 27. Argued November 25, 26, 1889. — Decided March 23, 1891.

M., a planter of Louisiana, died in 1860, leaving as his heirs, the minor children of his deceased daughter Julia, and the minor grandson of his deceased daughter Ann. At the death of his wife, in 1844, a large portion of the property then in his possession was community property, in which she was entitled to a half interest. Before his death he attempted, by sale and donation of specified estates, valued and appraised by him, to give to his daughter Julia (who was then living) her interest in the community property left by her mother and three-fourths of his own remaining estate; and, in a like way, to give to the grandson of his daughter Ann his like interest in the community property and the remaining one-fourth of his own estate. At his death he left a will with similar provisions. The parties each entered into possession of the properties thus respectively assigned to them, occupying in separate parcels,

without interference from the testamentary executor. But in 1869 the testamentary executor of M. made a simulated sale of all the lands at the instance of one of the parties concerned. A creditor of his estate then filed a bill on behalf of himself and other creditors, to set aside this sale as fraudulent, and to subject the lands to the payment of the testator's debts; and such proceedings were had thereon that this court, at October term, 1883, decided that the sale was fraudulent in fact, and that the lands in the hands of the heirs were liable for his debts. *Johnson* v. *Waters*, 111 U. S. 640. The cause having been remanded to the Circuit Court for further proceedings and to afford other creditors an opportunity to become parties, the representatives of the heirs of Julia and of the heirs of Ann respectively presented their claims as creditors for their interest in the community property, and also filed bills in the nature of supplemental or cross bills, setting up that they were not parties to the former decree, averring the validity of the sale declared fraudulent, setting up their claims to the community property, and claiming that they should be allowed for improvements. The creditors' representative answered, that the debts for the community property had been fully paid from rents and revenues, or, if not paid, had, under the laws of Louisiana, become subordinated to the debts of ordinary creditors. Further evidence was taken in addition to that in the original cause: *Held*,

(1) That the decision in *Johnson* v. *Waters* was right as to the fraudulent character of the sale made in 1869, and that it be affirmed;

(2) That the act of sale and donation to M.'s daughter Julia, mentioned in *Johnson* v. *Waters*, was void as a donation, but valid as a sale to the extent of the consideration named therein; to wit, the debt due to her for her share in the community property, and the sum to be paid by her to the other heir;

(3) That any debt which may have been due from M. to either of his heirs on account of the community property, was more than satisfied by their respectively receiving that portion of the property which was intended by him to be a satisfaction of it, and by the rents and revenues received since his death; and that such portion in aliquot parts should be held by them free from the other debts of the estate; but that the remaining portion should be sold to pay said debts;

(4) That, being minors at the time they became heirs, they were, under the law of Louisiana, heirs with benefit of inventory, and not personally liable for the debts beyond the amount of the property which was not received in satisfaction of their own claim upon the community;

(5) That on equitable grounds they should have some allowance or consideration, beyond the use of the property, for improvements which they had placed upon it, and for restoration of its condition after floods and other devastations;

(6) That in view of the conflicting evidence and the difficulty of arriving at an accurate adjustment of equities this court would direct

that the respective interests of the heirs be increased as indicated
in the opinion;

(7) That there is nothing in the sections of the Civil Code of Louisiana,
referred to in the opinion, which conflicts with these equitable
conclusions.

IN EQUITY.    The case is stated in the opinion.

*Mr. J. Ward Gurley, Jr.,* and *Mr. John G. Simrall* for Mel-
len.    *Mr. B. T. Sage* was with them on the brief.

*Mr. Thomas J. Semmes* for the heirs of Julia Morgan.

*Mr. J. R. Beckwith* for Buckner and others.

*Mr. John T. Ludeling* for the creditors.

MR. JUSTICE BRADLEY delivered the opinion of the court.

These cases are supplementary to that of *Johnson v. Waters,*
111 U. S. 640, decided by this court on appeal from the Cir-
cuit Court for the District of Louisiana in October term, 1883.
In that case, William Gay, a judgment creditor of Oliver J.
Morgan, deceased, to the amount of $33,250, besides interest,
filed a bill on behalf of himself and all other creditors of the
deceased who might come in and contribute to the expenses
of the suit, to subject five certain plantations in Carroll parish,
Louisiana, of which Oliver J. Morgan had died possessed, to
the payment of his debts, and to set aside as fraudulent and
void a pretended judicial sale of said plantations made to.
certain of the defendants in January, 1869.    The plantations
were named Albion, Wilton, Melbourne, Westland and Mor-
gana, and they lay together, the three former (the most valu-
able) fronting on the Mississippi River.    Oliver J. Morgan had
died in October, 1860.    His wife, Narcissa Deeson, had died
in 1844, and a large portion of the property was community
property in which she was entitled to a half interest, though
some of it was acquired after her death.    In 1857, in a proceed-
ing for partition of said property in the District Court for the
parish of Carroll, instituted by Oliver J. Morgan, a sale was

ordered, and the said Oliver became purchaser of the different tracts constituting the community lands, for the sum of $362,-201.80, one-half of which, after deducting an amount adjudged to said Oliver for improvements, was due to the heirs of his said wife, amounting to the sum of $134,991.40. There were two heirs, namely, Julia, the daughter of Oliver J. Morgan and his said wife, who had married, first, one Keene, by whom she had several children, and, secondly, Oliver T. Morgan, by whom she had a daughter; the other heir was Oliver H. Kellam, Junior, a grandson of Ann Morgan, deceased, another daughter of said Oliver J. Morgan and his wife who had married one Kellam, by whom she had a son Oliver, (then deceased,) who was the father of said Oliver H. Kellam, Jr. These two heirs, therefore, Julia Morgan, the daughter, and Oliver H. Kellam, Jr., the great grandson, were each entitled to one-half of the said sum of $134,991.40, making due to each the sum of $67,495.70. In the adjudication of sale by the sheriff it was expressed that Julia Morgan was present and by authority of her then husband, Oliver T. Morgan, requested that the amount due her should be left in the hands of her father; and it was also expressed in the act that the amount due to the minor, Oliver H. Kellam, Jr., was left in the hands of Oliver J. Morgan, his grandfather, to be paid to his tutrix and mother, Mrs. Melinda Kellam, when demanded.

Shortly after this sale, in March, 1858, the said Oliver J. Morgan, by an act of sale and donation, transferred, or attempted to transfer, to his daughter Julia, three-fourths of all his property, comprising the four plantations, Albion, Wilton, Westland and Morgana. The transfer was made subject to Mr. Morgan's own usufruct for life, and Julia and her husband accepted the transfer by joining in the act. The object and intent of the donor was expressed in the act as follows, to wit:

" Now, for the purpose of paying to the said Julia Morgan, wife of Oliver T. Morgan, residents of this parish, she appearing and making herself a party to this deed with the authorization of her said husband, the said sum of sixty-seven thousand four hundred and ninety-five dollars and $\frac{70}{100}$ due as aforesaid, and at the same time so to divide the entire landed estate of

this appearer, as well that purchased by him at the sale aforesaid as all his other lands, so as to give to the said Julia Morgan, wife of said Oliver T. Morgan, three-fourths of his landed estate, and to the said Oliver H. Kellam one-fourth, in the event that said Oliver H. Kellam survives this appearer, after paying each of said heirs in lands according to the estimates put upon the portions which may be conveyed to each, this appearer makes this act of sale and donation unto the said Julia Morgan of the following lands, and for the amounts of the estimated value beyond the extinguishment of the debt aforesaid, to wit ($67,495.70), this act is a donation of the lands hereinafter described unto the said Julia Morgan and her heirs forever:" [then follows a description of the several properties transferred. The act then proceeds]: "The estimated amount of the lands hereby conveyed and donated exceeds the amount of the debt due the said Julia Morgan to the amount of two hundred and thirty-six thousand seven hundred and fifty-eight dollars and $\frac{52}{100}$ ($236,758.52). To the extent that it exceeds three-fourths of the estimated value of the entire landed estate of this appearer, after the extinguishment of the debt aforesaid, she is to pay over to the minor, Oliver H. Kellam, in the event that he survives this appearer, to wit, the sum of nine thousand five hundred and thirty-[three] dollars and seventy-two cents, it taking this amount to make up one-fourth of the lands, upon the estimate now made, intended for the said Oliver H. Kellam, in extinguishment of the debt due him; and beyond this payment of the debt, it being intended that he should have the estimated value of one-fourth of the land of this appearer; it being the intention of this appearer that the said Julia Morgan shall have beyond the portion that she would inherit as an heir all the portion that this appearer could dispose of, so that his other grandchildren may get ultimately, as near as may be, a portion equal to that which may fall to the said Oliver H. Kellam as a ' forced heir' to this appearer."

Then, after reserving the usufruct of all the lands during the donor's own life, the act sets forth with particularity the basis upon which the division of the lands was made, and the valuation of the portion allotted to each heir, as follows: —

"Whole amount of community lands......... $362,201 80
Lands acquired since the dissolution of the
    community ....:.................... 75,760 00

Whole amount of land................ $437,961 80

Deduct amount due to heirs arising from sale
    of community lands on the 18th of January,
    '58. to each $67.495.70.................. 134,991 40

        Balance divided by four.......... $302,970 40

Portion coming to Oliver H. Kellam........ $75,742 60
Amount due him as above................ 67,495 70

Entire interest of Oliver H. Kellam, in esti-
    mated value of lands................... $143,238 30

Three-fourths interest for Julia Morgan..... $227,227 80
Amount due as above.................... 67,495 70

        Entire interest of Julia Morgan.... $294,723 50

Value of land conveyed in this deed to Julia
    Morgan .............................. $304,254 22
Deduct entire interest.................... 294,723 50
       Excess to be accounted as before
         stipulated ..................... $9,530 72 "

This estimate of the then value of the lands has never been questioned by any of the parties.

On the 1st of May, 1860, Oliver J. Morgan made his will, and, after bequeathing some personal legacies, as if apprehending that the act of donation to Julia might not be valid, he disposed of his property in substantially the same manner as he had done in said act. The following disposition was made by the will:

"Fourth, I give and bequeath unto my beloved daughter, Julia Morgan, one-half of all the residue of my estate, it being

my intention thereby to give to her all that portion of my estate that I have a right to dispose of over and above the portions going to my forced heirs; and in the event of my said daughter Julia dying before I do, then it is my will and I do hereby bequeath unto her children, Narcissa Keene, Alexander C. Keene, William B. Keene, Morgan Keene and Julia H. Morgan, or such of them as may be living at my death, the said one-half of my entire estate as above, it being my will that my said daughter shall have, inclusive of her forced heirship, three-fourths of my entire estate, but in the event that should she die before I do, then it is my will and the express intention of this testament that those of her children who may be living at my death shall have the said three-fourths of my estate."

The testator appointed Oliver T. Morgan, his nephew and son-in-law, executor of his will, who proved the same in due course, and in November, 1860, had an inventory of the estate taken, which showed:

| | |
|---|---:|
| Real estate | $947,153 80 |
| Slaves | 196,961 00 |
| Other personal property | 38,200 00 |
| Total | $1,182,314 80 |

The representatives and heirs of Oliver J. Morgan went into, or continued in, possession of his property in accordance with his will and the intent he had expressed as to the undisposed portion. The slaves were divided between them. Julia Morgan, his daughter, died before he did, in May, 1860, leaving the children named in his will, who were then minors. Her husband, Oliver T. Morgan, executor of the will, and also executor of his wife's will, took possession of the four plantations given to her, and then belonging to her children. He managed the property in their interest, being natural tutor of his own daughter, Julia H. Morgan, who was only two years old at her mother's death. Narcissa Keene, the eldest of Julia Morgan's children, and the only one of the Keene children

that seems to have survived childhood, says that she was thirteen at her mother's death, (May 1, 1860,) and was married to Matthew F. Johnson, December 27, 1860. Henry Goodrich, nephew of Oliver J. Morgan, and at one time manager of the plantations, says that in 1861 the mansion house at Wilton was occupied by Oliver T. Morgan and Matthew F. Johnson. As stated in our former opinion, "through the management of agents, and in other ways, considerable income was derived from the lands prior to the sale which took place in 1869. The crop of 1860 was over 2500 bales of cotton, which must have produced at least $90,000 after General Morgan's death. The sum of $21,800 was recovered from the government for cotton collected under the superintendence of army officers in 1862. The defendant Buckner, being examined as a witness, states that 'Montague had charge of and cultivated Melbourne and Wilton in the year 1863, and H. B. Tebbetts had charge of some of the places during 1864 and 1865. In 1866, H. B. Tebbetts rented Wilton and Melbourne. Don't think he took Albion. He was to pay ten dollars per acre rent for all the land that he cultivated. Tebbetts promised Matt. F. Johnson and witness to pay ten dollars per acre for such land as he should cultivate on Melbourne and Wilton in 1866. The most of the land was overflowed on Melbourne in 1866, and witness don't know how much land was cultivated. Wilton was not overflowed in 1866, to his knowledge. Witness states that Tebbetts paid him $3000 for the rent of Melbourne in 1866. Don't know how much he paid Matt. F. Johnson for Wilton, but that the rent was coming to Matt. F. Johnson from Tebbetts, according to the contract. Matt. F. Johnson and Samuel L. Chambliss cultivated Wilton in 1867, together; that is to say, a portion of the place. Charles Atkins cultivated a small portion of Melbourne in 1868 as witness' agent and manager. Very little was made on the place in 1868. Witness don't remember who cultivated Wilton and Albion in 1868.' "

It thus appears that at no time, after the death of Oliver J. Morgan, except as they may have been interrupted by the presence and depredations of troops during the war, did his

heirs cease to occupy and enjoy his property; but always in separate parcels; Oliver T. Morgan and Matthew F. Johnson, for the heirs of Julia Morgan, occupying the Albion, Wilton and two outlying plantations, and Buckner, for the Kellam heirs, occupying Melbourne. And this condition of things continued until the receiver in the Gay suit took possession of the property at the end of 1884. Oliver T. Morgan died in August, 1873, and from that time, or before, Matthew F. Johnson seems to have acted as the head of that branch of the family in behalf of his wife and as tutor of her sister, Julia H. Morgan. Henry Goodrich, nephew of Oliver J. Morgan, says that he took charge, as manager, of Wilton and Albion plantations "in behalf of the heirs" in December, 1868, and continued in charge until about April, 1873, when he was succeeded by C. M. Tilford in behalf of the same parties. Tilford says that he became manager and agent of Wilton and Albion plantations for Matthew F. Johnson in February, 1873; that the contracts made by him with the laborers were in the name of "Matthew F. Johnson, tutor for the minor children of Julia Morgan;" and that he continued agent for 1873, 1874 and 1875, when he was succeeded by J. W. Erwin. Erwin states that he came to take charge of the Wilton and Albion plantations in behalf of "Matthew F. Johnson, and the heirs of Julia Morgan," and had continued in charge until the time of giving his testimony. These witnesses were examined in March, 1878; and it is clear that if the character of executor or dative executor was ever assumed by Oliver T. Morgan, or Matthew F. Johnson, it was a mere matter of form, and that they really possessed and managed the property for the heirs. The will was substantially and in effect carried out in this respect.

As to the interest of the other heir, Oliver H. Kellam, Jr., that was managed by his mother, Melinda Kellam, as his natural tutrix, and her second husband, John A. Buckner, whom she married in April, 1859. They continued in possession of the Melbourne plantation, one of the most valuable in the lot, representing the heir, just as Oliver J. Morgan had intended they should do. There is no doubt that (with the

$9530.72 payable by Julia) the value of that plantation, at that time, was abundantly equal to the amount due to Oliver H. Kellam, Jr., ($67,495.70;) and, in addition thereto, equal to the one-fourth part of Oliver J. Morgan's proper estate of which said Kellam was forced heir. It was so estimated by Mr. Morgan himself, and, as the subsequent inventory showed, the estimate was a low one; and the parties interested acquiesced in it.

As things then stood, therefore, the estate was liable and subject, in the hands of the heirs and executor, to the debts of Oliver J. Morgan, except such portions thereof as were received by the heirs in payment of the debts due to them on account of his wife's interest in the community property. The portion so received by Julia Morgan's heirs was valued at $67,495.70, due to her, and $9530.72, to be paid by her to Oliver H. Kellam, Jr., in all $77,026.42 out of the $304,254.22 worth of lands allotted to her, or $25\frac{32}{100}$ per cent of those lands. The portion so received by Oliver H. Kellam, Jr., or those acting for him, was valued at $67,495.70 due to him, less the sum of $9530.72 to be received from Julia's heirs; which would leave $57,964.98 out of $133,707.58,[1] the valuation placed on the Melbourne plantation; or $43\frac{35}{100}$ per cent of that plantation. These portions of the lands respectively received by the heirs by way of payment were justly free from the claims of Oliver J. Morgan's creditors, supposing them not to have been personally liable, (being minors,) by reason of the portions received by them respectively as heirs or legatees. This was substantially the view which we entertained, though not fully expressed, in the case of *Johnson* v. *Waters*.

We held in that case that the act of sale and donation made by Oliver J. Morgan to his daughter Julia in March, 1858, was void as a donation; and that if it could be held good as a sale it could only be for the part which went to pay her the amount due from her mother's estate, together with the amount she was directed to pay to Oliver H. Kellam, Jr.; but whether good as a sale in part we did not then decide, though inclined

---

[1] This sum is obtained thus: $143,238.30 less $9530.72 = $133,707.58.

to think that it was.   The court below seems to be of opinion
that it was not.   But we have seen nothing to change the
impression which we then had; especially as the donor ex-
pressly declared in the act itself that he intended it as a sale
in part and a donation in part; a sale to the extent of the
amount due his said daughter, and a donation as to the residue.
This view makes still stronger the position that the part which
was received by way of sale was free from the debts of Oliver
J. Morgan.   We have given careful attention to the argument
made on behalf of the heirs of Julia Morgan in favor of the
validity of the donation, but adhere to our former view on
that subject.   It is unnecessary to go over the subject again.
Counsel is mistaken in supposing that any importance was
attached to the designation of the consideration of that act as
a "charge."   In that regard we only held that, even if it was
a charge, it was not sufficient in amount to make the donation
an onerous one.

That Julia Morgan and her heirs were concluded by the
dispositions made by her father seems clear; for she and her
husband joined in the act of donation and sale, and the will
did not change the destination of the estate.   It is contended,
however, that Oliver H. Kellam, Jr., being then an infant,
and not represented in the judicial proceedings taken, or in
the acts executed by Oliver J. Morgan, was not bound thereby.
Even if that were so, we do not see that the position of things
would be substantially changed.   The fact was that Mr. Mor-
gan's arrangements had long been in contemplation and had
been partially carried out before his death.   He had put the
Kellams in possession of the Melbourne plantation several
years before, and intended that plantation as going to make
up their share of the whole estate; and his daughter Julia and
her family lived with himself, and her husband had special
charge and possession of Westland, (if not of Morgana,) and
came into possession of all except Melbourne on Mr. Morgan's
death.   After that, both parties continued in possession in
accordance with the disposition made by him.   Each heir had
the portion intended for him or her, and if the debt which he
formally incurred to them for his wife's community property

was not technically paid, nevertheless they received that identical property in specie in the shape of the lands which were allotted to them. The proceedings instituted by Mr. Morgan for obtaining his wife's interest in the community property were more of a transaction on paper than a real one, and produced no change in the devolution of the estate. The heirs obtained all that they would have been entitled to in any event; and whether they received the portion coming from their ancestor, Narcissa Deeson, by way of inheritance from her, or by way of payment for that inheritance, it all came to the same thing in an equitable point of view. In either case they were entitled to hold it free from the debts of Oliver J. Morgan, and had no claim as creditors against his other property. The attempt now to set up those debts, or either of them, for the purpose of defeating the just claims of the real creditors is clearly inequitable. This was our view in the former case, and it is not changed by anything that has been shown in the cases now under consideration.

The bill in the case of *Johnson* v. *Waters* was specially directed to set aside as fraudulent and void a pretended sale of all the lands of Oliver J. Morgan, made in January, 1869. John A. Buckner, one of the plaintiffs in the present case, had applied to the parish court of Carroll parish for a sale of all of said lands to pay the debts of the estate, and particularly the pretended debt of $67,495.70, due to his daughter Mollie Buckner as heir of Oliver H. Kellam, Jr., alleging that it was a judgment debt, and had a preference over other claims; and Oliver T. Morgan, as executor, intervened in the petition in aid thereof. An order of sale was accordingly made, a sale followed, and John A. Buckner became the purchaser of the Melbourne, Wilton and Albion plantations, at three dollars per acre; and the other two plantations were sold for the same price, one to J. W. Montgomery, one of the lawyers in the case, and the other to F. M. Goodrich, another of the lawyers therein. The facts with regard to this transaction are fully stated in the opinion in *Johnson* v. *Waters*, 111 U. S. 655, 669. Suffice it to say, that we were satisfied from the evidence that the sale and all the proceedings that resulted in the sale were

fraudulent in fact, and conceived and carried out for the sole purpose of defrauding the real creditors of Oliver J. Morgan, deceased, and of getting in the title for the benefit of the heirs without paying any of the debts. We accordingly concurred with the Circuit Court in setting aside the said sale as fraudulent and void for fraud in fact; and not on the ground, as, in the bill of complaint in one of the present cases, is ingeniously, if not ingenuously, surmised, that the fraud consisted in Buckner's pretending to be, as tutor of his daughter, a creditor of the succession of Oliver J. Morgan for the sum of $67,495.70 with preference; though the setting up of that debt in the manner in which it was done was one of the means employed for carrying out said fraud. The evidence on this subject is quite fully set forth in the opinion in *Johnson* v. *Waters*, and need not be further adverted to. It is all introduced in the present cases by stipulation, and we find nothing in the evidence taken in these cases to alter our opinion. It is unnecessary to notice the pretended judgment of Buckner, as tutor of Oliver H. Kellam, Jr., against the estate of the latter, as it can have no effect on the rights of the parties in these suits, being, in any event, subordinate to the claims of Oliver J. Morgan's creditors. The assertion in the brief of counsel that said judgment was the debt sought to be recovered by the probate proceedings and sale in 1868–9 is contradicted by Buckner himself in his bill filed in these cases.

Our conclusion and decree then were:

1st. That the debt of Gay, the complainant, as represented by his administrator, Waters, (now by Mellen, administrator *de bonis non*,) be established and confirmed.

2d. That the sales complained of, made in January, 1869, be declared null and void, as against the estate of Gay and the other creditors of Oliver J. Morgan, deceased; and that it be referred to a master to take and state an account of the assets belonging to said Morgan's estate in the hands of the dative testamentary executor, Matthew F. Johnson, one of the defendants; and to give notice to creditors to come in and prove their debts.

3d. That if other assets were not sufficient to pay such

debts, the master should sell so much of the said lands as might be necessary to pay them; dividing the proceeds *pro rata* if not sufficient to pay all the creditors whose debts should be established, after paying all the complainants' costs.

4th. That the master might apply for instructions, especially as to whether the succession of Julia Morgan was entitled to any portion of the proceeds arising from the sale of the lands, by virtue of said act of donation and sale made to her by Oliver J. Morgan in 1858. so far as said act was a sale and not a donation.

The cause was remanded to the Circuit Court, a reference was ordered according to the decree, and the matter was opened before the master. On this reference the heirs of Julia Morgan and Buckner as representative of the Kellam interest presented each their claim for $67,495.70, and interest, as a debt against the estate of Oliver J. Morgan, deceased, as if the reference included them and was intended for their benefit, as creditors of his estate. But said claim was presented with reservation of rights to be set forth in the bills now before us, which they proposed to file.

Thereupon they filed the bills in the two cases now here on appeal.

One of the bills is filed by John A. Buckner for himself and as tutor of his minor child, Etheline Buckner, in the nature of a cross-bill against Stephenson Waters, (for whom Delos C Mellen has been substituted,) administrator, etc., of William Gay, deceased; and is in fact, as it is styled, a bill in the nature of a cross-bill to the said suit of Gay referred to as *Johnson* v. *Waters*. By a strange fatality in the course of events, Buckner and his daughter, the present representatives of Ann Kellam, (née Morgan,) and of her grandson, Oliver H. Kellam, Jr., have not a particle of Morgan or Kellam blood. Oliver H. Kellam, Jr., the last of that line, died young, leaving as his heirs his mother, Melinda Kellam, and his half brother and sister, children of his mother by John A. Buckner. The mother and brother dying, the sister Louise (or Mollie) and her father Buckner became the heirs. Louise dying, left her father, Buckner, and her half sister by a second wife of Buck

ner, her heirs. So that the succession of the Morgan-Kellam line has come to be represented by entire strangers.

The other bill is filed by Narcissa Keene, wife of Matthew F. Johnson, and Julia H. Morgan, wife of George G. Johnson, their husbands joining for the sake of conformity. It is filed as an original bill in the nature of a supplemental bill and cross-bill, against Stephenson Waters, (for whom Delos C. Mellen has been substituted,) administrator, etc., of William Gay, deceased. Narcissa K. Johnson is the only survivor of the Keene children of Julia Morgan, and Julia H. Johnson is the daughter of Julia Morgan by her second husband, Oliver T. Morgan.

The frame of the two bills is substantially the same. They first assert that the complainants, in their character of heirs and representatives of Ann Kellam and Julia Morgan respectively, were not parties to the suit of *Johnson* v. *Waters,* and are not bound by the decree therein. This averment is in a measure true. That suit was brought against Oliver T. Morgan, the executor of Oliver J. Morgan, (who made the fraudulent sale complained of,) and John A. Buckner, J. West Montgomery, and Ferdinand M. Goodrich, the purchasers at that sale. Whilst this is so, it is also true that the real controversy in the whole case was stoutly litigated. Buckner, one of the present complainants, was the principal and most interested defendant; and Oliver T. Morgan was the executor both of Oliver J. Morgan and his own wife, Julia Morgan. The bills then go on to give the history of the estate of Oliver J. Morgan, and Nancy Deeson's community interest, the sale of that interest to Morgan, the act of donation and sale to Julia Morgan, etc., referring to the printed record in *Johnson* v. *Waters* for the copy of the act. Buckner, in his bill, claims that the Melbourne plantation, when given to the Kellams, was uncleared and unimproved, and the ancestor of Oliver H. Kellam, Jr., cleared and improved it, and the Kellams always treated it as their own property, with the assent of Oliver J. Morgan. He refers to the proceedings in the parish court in 1868–9, and the sale in January, 1869, as prosecuted in good faith, and free from any fraudulent intent; but he admits that this court set aside the

said sale as fraudulent, and avers (though untruly) that the court declared that the fraud consisted in Buckner's pretending to be (as tutor) a creditor of the succession of O. J. Morgan for $67,495.70, with preference, when, in reality and in equity, there was no such thing as a debt due from him to his grandson, because the giving and setting apart of Melbourne plantation to the Kellams was intended to be in satisfaction of their rights in the succession of Narcissa Deeson, and in point of fact the succession of O. J. Morgan owed no debt to Oliver H. Kellam, Jr. Adopting this version of the decree of this court, Buckner says that he is well satisfied to accept said plantation on that basis, and abandon all claim as creditor of O. J. Morgan, and offers to do so on the rendition of a decree recognizing him and his child, Etheline, as owners of said plantation, and prays for such a decree. Otherwise he claims one-half of the community property in conjunction with Julia Morgan's heirs. He mentions having presented his claim for $67,495.70 before the master, with a reservation; and submits his rights to the court.

He alleges that such are the complications of the rights of the heirs in consequence of the action of Oliver J. Morgan, and his representatives, and the creditors, that the aid of the court is necessary to adjust the rights of all the parties, and hence he files his bill for its direction in the premises and for the protection of his rights and those of his child, Etheline.

The bill of Narcissa K. Johnson and Julia H. Johnson is similar to that of Buckner, and prays similar relief.

The defendant Waters, administrator of Gay, filed answers to these bills, in which he takes the ground that the plantations in question became the sole property of Oliver J. Morgan, by virtue of his purchase of the same in 1858, at the sale of the community property; but that the debt incurred for such purchase has been fully paid to the heirs by their reception and enjoyment of the revenues and profits of the lands; that they went into possession of said lands as heirs of Oliver J. Morgan without benefit of inventory, and thus became personally liable for all his debts; and that if the debts due to them have not been fully paid, they have at least become subordinate and

inferior to the debt due to the defendant, and have also become prescribed by lapse of time; and they plead the prescription of three, five and ten years.

On the 5th of March, 1885, the solicitors of the respective parties entered into a written agreement that the two causes should be consolidated and tried together, and considered as if the complainants in each had been made defendants in the other, and that Matthew F. Johnson, in his capacity of dative testamentary executor of Oliver J. Morgan, should appear and become a party; and that the bill in each case should be treated as an answer in the other case. Johnson appeared accordingly as dative testamentary executor, and filed a paper admitting the facts set forth in the bills of complaint.

In July, 1885, the following stipulation, agreed to by the solicitors of the parties, was entered into in the consolidated case:

"The parties, by their solicitors, for the purpose of avoiding delay and expense, and of bringing these causes to a speedy trial, stipulate as follows:

"1st. The answers filed in these causes, before consolidation, shall be taken and considered as the answers to the consolidated causes, and apply to new parties introduced since they were filed as well as to those then parties.

"2d. The causes shall be considered at issue as if replications had been filed, and no further replications than the provisions of this agreement shall be necessary.

"3d. A copy of the record in cause 6612, referred to in the pleadings in these causes, and numbered 297 on the docket of the Supreme Court of the United States, as the same was printed for use in the Supreme Court of the United States, shall be filed in evidence." [This is the record in *Johnson* v. *Waters*.] "All documents copied therein shall be taken and considered as if they were separately authenticated by the proper officer and without other evidence of their authenticity than the fact that they are found in said printed record.

"It is not intended by this agreement to waive any legal objection to the introduction in evidence of any document or depositions printed in said record which might or could be

made to the original depositions if produced and offered, objections as to form being waived.

"4th. The judgment and decree of the Supreme Court of the United States in said cause 6612, (297 of that court,) as the same is printed in Vol. 111 of the printed reports, may be used in evidence without further proof or the production of a certified copy thereof; but this agreement, in this respect, is intended to waive form only and not any objection to the admissibility in evidence of said decree on other grounds, nor to its effect when introduced in evidence."

The parties thereupon took further evidence. A certificate of the clerk of the District Court for the parish of Carroll, custodian of its probate and succession records, showed that Oliver T. Morgan, executor of the succession of Oliver J. Morgan, never filed or rendered any account of his administration of said succession, except one purporting to be a final account, filed 8th February, 1870; and as executor of Julia Morgan, never filed or rendered any account whatever; and that Matthew F. Johnson, dative testamentary executor of the succession of Oliver J. Morgan, never filed or rendered any account, or any bond. The final account of Oliver T. Morgan, referred to by the clerk, was a mere perfunctory one, exhibiting an exact balance of receipts and disbursements; the receipts consisting of the bids for the property at the fraudulent sale of January, 1869, and the disbursements, consisting of credits on the pretended claims of the bidders, Buckner and the lawyers and certain creditors whom they professed to represent. The truth is, as before intimated, that there never was any *bona fide* administration of the estate; but each of the two sets of heirs, or their tutors for them, took and kept possession of the respective portions of the real property intended for them by Oliver J. Morgan, and divided between themselves and took possession of the slaves and other property of the estate. The complainants, Narcissa K. Johnson and Julia H. Johnson, testifying as witnesses in the case, allege that they never received anything from the estate. But this is hardly consistent with the fact that Oliver T. Morgan, the father of one of them, and step-father of the other, lived with them on the

property, and on his death Matthew F. Johnson, the husband
of Narcissa, was appointed dative testamentary executor, and
in that nominal capacity had control of all the property not
occupied by Buckner or by the lawyers who bid off the West-
land and Morgana plantations, until the said Julia married,
when she and her husband, George G. Johnson, were put into
possession of a portion of it. They have lived on the property
as their own, and have received and enjoyed whatever it was
capable of yielding. This is shown by the testimony of Good-
rich, Tilford and Erwin, before referred to, and there is much
more evidence in the case to the same purport.

The same thing is true with regard to the occupation of
Melbourne by the Kellam branch of the family, namely, by
Oliver H. Kellam, Jr., with his mother and natural tutrix, and
by John A. Buckner and his children. The only pretension of
their being unpaid creditors of the succession was made as a
part of that fraudulent scheme which resulted in the sale of
January, 1869, which we have already decreed to be void, and
with regard to which we still hold the same opinion.

The testimony of John A. Buckner himself, taken in the
original cause, substantially corroborates this view of the case.
In addition to what has already been quoted from his exami-
nation, he then said:

"Witness says that he has never had corporeal possession of
Wilton or Albion plantations. Since the war Matt. F. John-
son has had the actual control and management of Wilton and
Albion plantations, as he, witness, supposed, in interest of his
wife, one of the heirs, and the other heirs of Julia Morgan.
Matt. F. Johnson and the heirs of Julia Morgan have never
set up any adverse claim to witness in regard to Melbourne
plantation.

"They have confined their pretensions to Wilton and
Albion, and have had the control of said plantations ever
since the war, though Oliver T. Morgan, as executor, has exer-
cised some authority over the property. . . .

"Matt. F. Johnson, in behalf, as witness supposes, of the
heirs of Julia Morgan, has exercised full control over the prop-
erty and leased and controlled the property and exercised the

rights of ownership over the same ever since the war, except that Oliver T. Morgan, executor, exercised authority several years after the war. . . .

"Witness says that the heirs of Julia Morgan have always claimed a greater share of the property than they considered him entitled to, as representing one of the heirships. There were two heirships to Judge Morgan's estate. One witness represents, and the other the heirs of Julia Morgan represent.

"The following question is propounded by counsel for complainant: — In the distribution of the property among the heirs of Oliver J. Morgan, wherein the heirs of Julia Morgan took Wilton and Albion and restricted witness, representing another heirship, to Melbourne, why did the heirs require such an unequal division? Was it or not on account of the extraordinary pretensions they set up as heirs of Julia Morgan, or why was it?

"Witness says it was because they claimed three-fourths of the estate. He does not know upon what their claim is based. Witness refers counsel to the records; says that there has been no final division between the heirs. *The heirs of Julia Morgan have held possession of the land they had before the war, and witness has held possession of the land he had before the war.* Witness does not hold the property in common; there is only a temporary division.

"Witness has held possession of Melbourne ever since the war, and the heirs of Julia Morgan have held possession of Wilton and Albion, except that the heirs recognized Oliver T. Morgan as executor, but he did not require of them any account of the rents and revenues.

"Witness says that his understanding was at the time of the sale, in January, 1869, when he bought in the property for the heirs, that they were to receive their proportion of the land purchased in witness' name, and he was to retain his proportion.

"They were (the heirs of Julia Morgan) to take three-fourths of the land and witness one-fourth, and this understanding was had as to the exact amount in the division after the sale. There was no conversation or agreement with the heirs, or any other parties, as to how the division should be made."

Buckner was reëxamined in the present cases, and states still more explicitly the fact that the Melbourne plantation was possessed and operated by him in the interest of the Kellam heirs, including his own children. He says:

" I married Mrs. Melinda Kellam, April 7th, 1859. Her son, Oliver H. Kellam, died in September, 1863. He was seven years old at the time of his death. My wife, Mrs. Melinda Kellam, died in September, 1863. My son John died one week afterwards. He was three years old at the time of his death. My daughter Louisa (called Mollie) died in March, 1883, and was 21 years and 6 months old at the time of her death. . . .

" Melbourne plantation was first set apart and given by Oliver J. Morgan to the ancestor of his great grandson, Oliver H. Kellam, (the son of my first wife,) in 1853. . . .

" The Kellams cultivated it as their own; had their own merchant, raised their own money with which to improve and plant the place, and were never called to account for rents or revenues, and never did so account for them, either to Judge Morgan or to any one else.

" It was in the possession of my wife, Mrs. Melinda Kellam, as natural tutrix, and myself, as cotutor to the minor, Oliver H. Kellam, at the time of the death of Oliver J. Morgan. The said plantation remained in the continuous possession of the Kellams or their representatives from the time it was originally given or set apart to them by Oliver J. Morgan until dispossessed by the receiver appointed by the court in suit No. 6612."

This was on his cross-examination. On his direct examination he had said :

" Oliver J. Morgan died in the spring of 1860. Upon his death the Melbourne plantation was claimed by and was in the possession of (as it had been for many years before) the Kellam heir. The other places were claimed by the heirs of Julia Morgan, but the executor took possession or control, and exercised authority over all but Melbourne. There was a change in 1869 ; after the succession sale took place Morgana was controlled by F. M. Goodrich, until he transferred it to

Samuel Boyd, of New Orleans, who had possession until 1st January, 1885.

"Westland after 1869 went under the control of some of the creditors of O. J. Morgan, and remained so until 1st Jan., 1885, and Col. Matt. Johnson controlled Wilton and Albion until about 1879, when Mr. Geo. Johnson took control of the lower part of Wilton and Albion.

"How much was controlled by the latter I do not know, and these two places remained under their control until 1st Jan., 1885.

"*As to Melbourne, it has never passed out of the representative of the Kellam interest.*"

The pretence that the Melbourne plantation was intended as a pure gift by Oliver J. Morgan to the Kellam family cannot be seriously maintained in view of the express declarations and provisions to the contrary made by Mr. Morgan in his lifetime; and is contradicted by the conduct of Buckner himself, in procuring Melbourne to be sold as part of the property of Oliver J. Morgan, at the sale of January, 1869, and becoming the purchaser himself, and filing a petition for homologation in which he expressly declares that it belonged to the estate of Oliver J. Morgan, deceased.

In addition to the evidence taken in the former case, further evidence has been taken in the present cases, as to the rental value of the property from the time of Oliver J. Morgan's death, and the value of the fruits and revenues which have been derived from it; and in this connection the complainants have adduced evidence to show that they have been at large expenses for repairs and for restoration of the lands after floods. We have carefully examined the evidence on these points, both that which has been adduced in the present suits and that which was taken in the case of *Johnson* v. *Waters*, and, without attempting to give an abstract of it, we shall only state our conclusion, which is substantially the same as that at which we arrived in that case, namely, that any debt which may have been due from Oliver J. Morgan to his heirs was more than satisfied by their receiving that portion of the property which was intended by him as a satisfaction, and by the

rents and revenues received since his death. Though heirs with benefit of inventory, (being for the most part minors at the time of their becoming such,) they were nevertheless chargeable, as against any claims of their own, for what the estate was worth when the succession commenced; and that far exceeded the amount of such claims. *Changeur* v. *Gravier*, 4 Martin, N. S. 68.

We think, however, that it would be proper, not as a matter of strict right, but on equitable grounds, that they should have some allowance or consideration, beyond the use of the property, for improvements which they have placed upon it, and for restoration of its condition after floods and other devastations. But, in view of the conflicting evidence as to the annual value of the lands, since Oliver J. Morgan's death, and the great lapse of time that has occurred, it would be difficult, if not impossible, to arrive at any precise and accurate adjustment of the equities arising out of all the complications of the case; and the creditors might well say that their claims should have been satisfied when the estate was abundantly able to pay them, and before the restorations were necessary. The best that can be done, with a view to the interest of all the parties, and the termination of a vexatious litigation, is to make such award and decree as, on the whole, seems most equitable and just. With this view, we see no better disposition to be made than to increase somewhat the percentage of interest in the lands to be reserved to the complainants, and to order a division of the lands to be made, if they shall so desire. This will enable each party to obtain and secure his, or their, own rights without sacrificing those of the others. To allow the complainants to go before the master in the Gay suit, and prove their antiquated claims, principal and interest, would enable them to sweep away nearly all the property, and leave the creditors nothing. This certainly would be most inequitable. Whilst to allow the creditors to sell the whole property in order to raise the amount of their debts would be equally inequitable, for it would leave nothing for the heirs, who have a meritorious claim arising from the interest of their ancestor, Narcissa Deeson. We think it is admissible and,

under all the circumstances of the case, would be just, to increase the interest to be reserved to the heirs of Julia Morgan in the four plantations allotted to them, from $25\frac{32}{100}$ per cent to forty per cent or two-fifths, and to increase the interest to be reserved to the heirs of Oliver H. Kellam, Jr., in the Melbourne plantation from $43\frac{35}{100}$ per cent to fifty per cent, or one-half. And in setting off to them their separate portions respectively as thus defined, if they shall desire the same to be so set off, any permanent buildings which they may have erected on said portions should not be added to the value of the lands thus assigned to them, in making the division between them and the creditors. The remainder of the lands should be sold for the benefit of Gay's administrator and the other creditors who shall have established their claims before the master in the original suit, not including the complainants. If the heirs should not desire to have their portions set off separately, then the whole property is to be sold, and they are to receive their proportional share of the proceeds, but no allowance for buildings. If any moneys remain in the hands of the receiver beyond the expenses incurred by him and his proper compensation, they should be divided between the creditors and heirs in the proportions above stated; and the portion due to the heirs should be applied, as far as requisite, to the payment of the costs awarded against them.

We have thus far expressed our views of the equities and legal aspects of the case without referring to particular laws or decisions. But, it is proper to add, that, besides other portions of the Civil Code of Louisiana, the following articles have been constantly borne in mind:

Art. 254. "If a mother who is tutrix to her children, wishes to marry again, she must, previous to the celebration of the marriage, apply to the judge in order to have a meeting of the family called for the purpose of deciding whether she shall remain tutrix." . . .

Art. 255. "When the family meeting shall retain the mother in the tutorship, her second husband becomes of necessity the cotutor, who, for the administration of the property, subsequently to his marriage, becomes bound *in solido* with his wife."

We assume that the due formalities were observed with regard to the tutorship of the minor heirs who from time to time became interested in the property of Oliver J. Morgan. This presumption is the most favorable to the parties, and should be made unless the contrary appears.

Art. 352. "It shall not be necessary for minor heirs to make any formal acceptance of a succession that may fall to them, but such acceptance shall be considered as made for them with benefit of inventory by operation of law, and shall in all respects have the force and effect of formal acceptance."

Art. 1032. "The benefit of inventory is the privilege which the heir obtains of being liable for the charges and debts of the succession only to the value of the effects of the succession, by causing an inventory of those effects to be made within the time and in the manner hereinafter prescribed."

The heir with benefit of inventory is bound only to the amount the estate was worth at his ancestor's death. Of course he is bound to that extent. *Changeur* v. *Gravier*, 4 Martin N. S. 68.

Art. 1054. "The effect of the benefit of inventory is that it gives the heir the advantage:

"1. Of being discharged from the debts of the succession by abandoning all the assets of the succession to the creditors and legatees.

"2. Of not confounding his own effects with those of the succession, and of preserving against it the right of claiming the debts due from it."

In the present case the heirs did not abandon the assets of the succession to the creditors, and the debts due to them from the estate were satisfied in the manner hereinbefore stated. The portion of the property received in satisfaction we propose shall be set off to them in severalty, if they shall desire it, so that it may not be confounded with the residue.

Art. 1058. "But if the heir declares that he is not willing to accept the succession otherwise than with the benefit of an inventory, the person appointed administrator of the estate, whether it was the heir himself or any other individual, shall proceed to the sale of the property of the succession and to

the settlement of its affairs, as prescribed in the following articles: The beneficiary heir shall, at the time of such settlement, have a right to be paid, as any other creditor, all debts due him by the deceased, and shall, moreover, be entitled to the balance of the proceeds of the sale of the estate, if any such balance be left after the payment of all the debts and charges of the succession."

As the debts due to the heirs in the present case were satisfied and paid by the property received for that purpose, this article has no special bearing upon the result.

The question arising from the incapacity of minor heirs has already been adverted to.

Upon the final hearing of the cases as consolidated, the court below, on the 15th of June, 1886, made the following decree, to wit:

"These consolidated causes came on to be heard at this term on final hearing and were argued by counsel, and thereupon, upon consideration thereof, it is ordered, adjudged and decreed by the court that the bills of complaint of the complainants, John A. Buckner and others and Narcissa Keene, wife of Matt. F. Johnson, and others, be dismissed, reserving the right to said complainants, except said Buckner in his own right, to go before the master appointed in the case of *Waters, Adm'r,* v. *Johnson et al.,* No. 6612 of the docket of this court, and prove up as ordinary claims against the estate of Oliver J. Morgan such sums as may be due them on account of the original indebtedness of Oliver J. Morgan to the heirs of Narcissa Deeson, which indebtedness is hereby recognized as originally $134,991.40, provided said complainants shall account for said property, rents and revenues of the said estate of Oliver J. Morgan as came to their hands as heirs or grantees of said Oliver J. Morgan, and it is ordered that said complainants do pay all the costs of the suit, said costs to be equally divided between the complainants in the two causes respectively."

On a full consideration of the case, we think that this decree should be reversed, and that a new and different decree should be made. Instead of dismissing the bills of the complainants, we think that those bills, being in the nature of cross-bills in

the suit of Waters, (now Mellen,) administrator of Gay, against the executor of Morgan and others, should be retained and consolidated with that suit; and instead of reserving to the complainants in the present suits the right to go before the master in that case and prove their claims against the estate of Oliver J. Morgan for any supposed indebtedness due to them as heirs of Narcissa Deeson, (which indebtedness should be declared to be paid and satisfied,) a certain portion of the said plantations and real estate of Oliver J. Morgan, before referred to, should be reserved to them free from the claims of the creditors of said Morgan; that is to say, two-fifths of the four plantations, Albion, Wilton, Westland and Morgana, should be reserved for the benefit of the heirs of Julia Morgan, deceased, and one-half of the Melbourne plantation should be reserved for the benefit of the heirs of Oliver H. Kellam, Jr., deceased; and the remaining interest in the said plantations should be subjected to the payment and satisfaction of the debt due to said administrator of William Gay, deceased, and the debts of other creditors of Oliver J. Morgan who may have established their claims before the master in said Gay's suit in pursuance of the decree therein, not including any pretended claim or claims of the said Morgan's heirs. And the said portions so to be appropriated to the said heirs respectively, should be divided and set off to them in severalty, if they so desire, without charging them with the value of any permanent buildings erected by them on such portions. And a decree should be made for the sale of all remaining property in convenient parcels, and for an appropriation of the proceeds among the creditors as above stated. But if the heirs do not desire a severance of their portions, the whole to be sold, and they to receive their respective portions of the proceeds, but no allowance for buildings. In carrying out the said directions, if the heirs shall desire their portions to be set off in severalty, they may designate any buildings erected by them which they wish to retain, and the portion set off to them shall include said buildings, if it can be done without prejudice to the other parts; and in that case the value of such buildings shall not be included in the aggregate valuation of the land, nor charged

to the heirs in the valuation of the portion so set off to them with said buildings. And such decree should be made as the decree in the present consolidated case, and as a supplemental decree in the principal case, to which the present is related as by cross-bill.

Each party should pay their own costs on this appeal, except the costs of printing the record, which should be equally divided between the two parties, appellants and appellees. The costs in the court below up to this time should be paid by the complainants, as directed in the decree of the Circuit Court.

*The cause is remanded to the court below with directions to proceed in conformity with this opinion.*

### Decree.

*It is now here ordered and decreed that the said decree of the Circuit Court be reversed, and that a new and different decree be made in this consolidated case, and by way of supplement to the decree in the principal case of William Gay's administrator against Matthew F. Johnson, dative testamentary executor of Oliver J. Morgan, and others, that is to say, it is ordered and decreed that the bills filed by the complainants in the causes herein consolidated be retained, and the cases consolidated with the said principal case of Gay's administrator against Morgan's dative testamentary executor and others ; but that all relief prayed in and by said bills filed in the present cases be denied except as herein declared, namely : it is decreed that instead of reserving to the said complainants the right to go before the master in said suit of Gay's administrator, and to prove their claims against the estate of said Oliver J. Morgan, deceased, for any supposed indebtedness to them as heirs of Narcissa Deeson, the said claims are hereby declared to be satisfied and paid ; and that in place of said supposed claims the said heirs are entitled to have and retain a certain portion of said Oliver J. Morgan's estate free from the claims of his creditors, as follows, to wit : two-fifths of the four plantations, Albion, Wilton, Westland and Morgana, are directed and decreed to be reserved for the*

*benefit of the heirs of Julia Morgan, deceased ; and one-half of Melbourne plantation is directed and decreed to be reserved for the benefit of the heirs of Oliver H. Kellam, Jr., deceased ; and that the remaining interest in the said plantations is decreed and adjudged to be subject to the payment and satisfaction of the debts due to the administrator of said William Gay, deceased, and to the other creditors who shall have established their debts before the master in said Gay's suit, not including the complainants in this consolidated cause ; and it is further decreed that the portions so to be appropriated to said heirs respectively be set off to them in severalty, if they shall so desire, without charging them for the value of any permanent buildings erected by them thereon ; and that all the remaining portions of said plantations be sold in convenient parcels, and the proceeds appropriated to the creditors as above stated. And power is reserved to the court below to appoint commissioners to make division of said property in the proportions above named before said sale shall take place. But if the heirs shall not desire a severance of their portions, then the whole property to be sold, and they to receive their respective portions of the proceeds, but no allowance for buildings. Any moneys in the hands of the receiver, after paying his expenses and compensation, are to be divided between the creditors and heirs in the proportions above stated, applying the amount due to the heirs, so far as may be requisite, to the costs payable by them. In carrying out the said directions, if the heirs shall desire their portions to be set off in severalty, they may designate any buildings erected by them which they wish to retain, and the portion set off to them shall include said buildings, if it can be done without prejudice to the other parts ; and in that case the value of such buildings shall not be included in the aggregate valuation of the land, nor charged to the heirs in the valuation of the portion so set off to them with said buildings. It is further decreed that each party shall pay their own costs on these appeals, except the cost of printing the record, which shall be equally divided. It is also decreed that the costs in the Circuit Court up to the present time be paid by the complainants as directed in the decree appealed*

*from. It is further decreed that the cause be remanded with directions to the Circuit Court for the Eastern District of Louisiana to enter a decree in conformity herewith, and to proceed in accordance with the opinion of this court herewith filed.*

MR. JUSTICE BREWER and MR. JUSTICE BROWN were not members of the court when this case was argued, and took no part in the decision.